```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF ARIZONA
 2                         _____

 3
     Judith M. Rich and          )
 4   Vincent Vitale,             )
                                  )
 5                                )
                   Plaintiffs,    )
 6                                )   CV 11-00511-PHX-DLR
              vs.                 )
 7                                )   Phoenix, Arizona
     BAC Home Loans Servicing     )   October 3, 2014
 8   LP, et al.,                  )   8:53 a.m.
                                  )
 9                                )
                   Defendants.    )
10   _____)

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                    (Motion Hearing)

15
              BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE
16

17

18

19

20
     Official Court Reporter:
21
     David C. German, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC-39
23   Phoenix, Arizona 85003-2151
     (602) 322-7251
24
     PROCEEDINGS TAKEN BY STENOGRAPHIC COURT REPORTER
25   TRANSCRIPT PREPARED BY COMPUTER-AIDED TRANSCRIPTION
```

**APPEARANCES:**

**FOR PLAINTIFFS:**

        Judith M. Rich, Pro Se
        42505 W. Candyland Pl.
        Maricopa, Arizona 85138-3142

        Vincent P. Vitale, Pro Se
        42505 W. Candyland Pl.
        Maricopa, Arizona 85138-3142


**FOR DEFENDANTS BANK OF AMERICA NA, BRYAN CAVE LLP:**

        Bryan Cave, LLP,
        Attorneys at Law
        Two N. Central Avenue, Suite 2200
        Phoenix, Arizona  85004-4406
        By:  Gregory B. Iannelli, Esq.
             Sean McElenney, Esq.

UNITED STATES DISTRICT COURT

```
 1                          Phoenix, Arizona
                           October 3, 2014
 2

 3          (Proceedings convened at 8:53 a.m.)

 4          THE COURT:  Please be seated.

 5          THE COURTROOM DEPUTY CLERK:  Civil Case Number      08:53:13

 6   11-511, Rich and others versus BAC Home Loans Servicing, LP

 7   and others, on for oral argument.

 8          Counsel, please announce for the record.

 9          MR. VITALE:  I'm Vincent Vitale, one of the

10   plaintiffs.                                                08:55:37

11          MS. RICH:  Judith M. Rich, plaintiff.

12          THE COURT:  Good morning.

13          MR. IANNELLI:  Good morning, Your Honor.  Greg

14   Iannelli for Bank of America and Bryan Cave.  I have Sean

15   McElenney and Justin Monnie with me as well.              08:55:48

16          THE COURT:  All right.  Good morning.

17          Okay.  This is the time for oral argument on the

18   cross motions for summary judgment.  Primarily, I have

19   questions directed to the plaintiffs on some of the issue I

20   don't quite understand regarding your position.           08:56:02

21          Who is going to be responding?

22          MR. VITALE:  I will, Your Honor.

23          THE COURT:  Okay.

24          All right.  The issues I'm questioning first regard

25   your damages.                                             08:56:12
```

1          MR. VITALE:  I did not hear you, Your Honor.

2          THE COURT:  My first area of inquiry involves your

3   damages.

4          MR. VITALE:  All right.

5          THE COURT:  The first question is benefit of the          08:56:23

6   bargain.

7          MR. VITALE:  Yes.

8          THE COURT:  I think one of your theories is no

9   bargain was ever reached.  Is that right?

10          MR. VITALE:  No.  We're seeking promissory estoppel,     08:56:33

11   which suggests when the terms of the bargain were.

12          THE COURT:  Okay.  Explain that to me a little bit.

13          MR. VITALE:  The promise made to us was for a loan in

14   the principal amount of $195,000, 4.65 percent interest rate

15   over 40 years, with no balloon.                                 08:56:49

16          THE COURT:  Yeah.

17          MR. VITALE:  What was offered in September after we

18   accepted the offer and made the three payments was the same

19   loan plus a balloon payment.  It's the existence of the

20   balloon payment that distinguishes the two transactions.       08:57:00

21          THE COURT:  Okay.  Well, there was a period of trial

22   payments, right, your trial period payments?

23          MR. VITALE:  Yes.  Those were made in reliance on the

24   initial offer that did not include the balloon payment.  In

25   July of 2012 we received the TPP.                              08:57:27

```
 1          THE COURT:  Yeah.
 2          MR. VITALE:  Which did not include -- and the oral
 3   representations relating to it.  It did not include a balloon
 4   payment.  In fact, it included representations that there was
 5   no balloon payment.  We made the three TPP payments on time      08:57:41
 6   and the principal loan modification documents submitted to us
 7   in September of 2012 included an $83,000 balloon payment, a
 8   payment that had been explicitly stated to not be part of the
 9   deal prior to our making the three TPP payments.
10          THE COURT:  And is that why you stopped making           08:58:03
11   payments?
12          MR. VITALE:  Stopped making payments?
13          THE COURT:  On your mortgage.
14          MR. VITALE:  No.
15          THE COURT:  Okay.                                        08:58:12
16          MR. VITALE:  The payments had ceased prior to that
17   time.
18          THE COURT:  Okay.
19          MR. VITALE:  Once we entered negotiations with
20   Mr. Dvoren, the prior counsel in this case, they never asked    08:58:18
21   for payments.  What they asked for was extensions of time to
22   answer the complaint so we can engage in negotiations.  It was
23   always expected that any arrearages accruing would in one
24   fashion or another be addressed in a settlement or loan
25   modification.                                                   08:58:38
```

1          THE COURT:  So you stopped making payments pursuant

2    to the bank's request that you stop making payments?

3          MR. VITALE:  No.  Initially we stopped making

4    payments in December of 2010.  That was based on

5    Mr. Marshall's representations that we had to miss payments in    08:58:49

6    order to qualify for the loan.

7          THE COURT:  Okay.  That's what I thought.  So -- but

8    once you realized you didn't qualify why didn't you start your

9    payments up again?

10         MR. VITALE:  Because we were in negotiations with    08:59:00

11   Bank America through their attorney, Mr. Dvoren, and it was

12   understood during those discussions that accruing arrearages

13   would be dealt with one way or another in a final loan

14   modification.  And it was expected that would take 90 days.

15   It took over a year.    08:59:16

16         THE COURT:  When you say understood, that was part of

17   the agreement you had during negotiations that, okay, there's

18   no reason for you to make any more payments while we negotiate

19   because we'll wrap that up into the final resolution.  Was

20   that an express agreement you guys had?    08:59:27

21         MR. VITALE:  It was not an express agreement.  The

22   bank never asked for payments after March until the litigation

23   got much further along.  From March of 2011 through August of

24   2012 when we made our second application, other than sending

25   us the computerized monthly statements, at no time did the    08:59:42

```
 1   attorneys ask for payment.

 2           THE COURT:  So it was the obligation of the attorneys

 3   to ask for payment before the payments became due under your

 4   understanding.  Is that right?

 5           MR. VITALE:  No, it was not.  It was -- the question     08:59:53

 6   was -- there was no discussion about making the payments in

 7   the interim.

 8           THE COURT:  Okay.

 9           MR. VITALE:  They didn't ask for them.  We didn't

10   offer them.  It was understood -- it must be recalled it was     09:00:01

11   expected that this matter would be settled within 90 days

12   initially.

13           THE COURT:  Okay.

14           All right.  Now, you're claiming there were lost

15   opportunities.                                                   09:00:12

16           MR. VITALE:  Yes.

17           THE COURT:  Okay.  What specific programs did you

18   forgo applying to while you were -- you would have

19   qualified -- and do you have any evidence you would have

20   qualified for these programs had you not been pursuing the       09:00:27

21   more favorable modification offer that Bank of America

22   extended to you?

23           MR. VITALE:  We did not know at that time what other

24   programs were available because we were negotiating with the

25   bank.                                                            09:00:41
```

```
 1            THE COURT:  Okay.

 2            MR. VITALE:  As it turns out, we could have applied

 3    for, if this had not happened, the Save-Our-Home Program and

 4    what later became known as the HARP program.

 5            THE COURT:  Save Our Home and HARP?                    09:00:51

 6            MR. VITALE:  Yes.  We referenced those in the written

 7    materials.

 8            THE COURT:  Were those programs that you would have

 9    qualified for?

10            MR. VITALE:  But for the arrearage, I believe so.  I   09:01:03

11    cannot tell you that with any certainty.

12            THE WITNESS:  Okay.  That's just something you never

13    investigated.

14            MR. VITALE:  Not at that time.

15            THE COURT:  Have you investigated it ever?             09:01:13

16            MR. VITALE:  Well, I'm familiar with the terms of the

17    programs now.  If we didn't have the arrearages now, we could

18    probably qualify for Save-Our-Home-Arizona.

19            THE COURT:  But for the arrearages, you'd qualify for

20    Save-Our-Home-Arizona.                                        09:01:27

21            MR. VITALE:  Perhaps.  I don't know, because I'm not

22    that familiar with the program, but it's a possibility.

23            THE COURT:  Okay.  It's a possibility.

24            MR. VITALE:  It's possible.

25            THE COURT:  Okay.                                      09:01:34
```

```
 1          Now, you've been -- how long has it been since you
 2   made your last mortgage payment?
 3          MR. VITALE:  I believe it's 48 months.
 4          THE COURT:  Okay.  Four years.
 5          MR. VITALE:  Yes.                                    09:01:47
 6          THE COURT:  Okay.  Why shouldn't that four years not
 7   be applied as an offset or potential damages offset for the
 8   damage you claim you suffered by missing your monthly payments
 9   back in 2010?
10          MR. VITALE:  Because there's no mutuality of debt.   09:02:08
11          THE COURT:  Explain that to me a little bit more.
12          MR. VITALE:  The only remedy that the bank has
13   referencing this claim is the non-judicial foreclosure of the
14   property because it's a non-recourse note.  Non-recourse note
15   means just what it says.                                    09:02:24
16          THE COURT:  I understand that.
17          MR. VITALE:  And I cited the one case whose name I
18   can't recall at the moment where it was held by a Court that
19   you cannot offset against a non-recourse note.  Moreover --
20          THE COURT:  So they don't get any offset for any     09:02:36
21   portion of the payments you failed to make for four years
22   because it's a non-recourse debt.
23          MR. VITALE:  And because Bank of America claims it
24   doesn't own the note in the first place; Fannie Mae does,
25   according to the bank.  Why would Bank of America get an     09:02:50
```

1   offset for money owed to Fannie Mae?

2           I'm sorry.  Go ahead.

3           THE COURT:  Were you finished?

4           MR. IANNELLI:  Yes, I was.

5           THE COURT:  Okay.                          09:03:07

6           All right.  You may have already explained this to me

7   but I'm still not clear.  You've been living there and you

8   haven't paid anything on the mortgage for four years.

9           MR. VITALE:  That's right.

10          THE COURT:  And the reason you haven't done that is   09:03:26

11  because you entered in negotiations early on and you think

12  there was either an express or an implied agreement?

13          MR. VITALE:  No.  Once the TPP was offered to us, we

14  believe that that was a binding agreement.  We believe that

15  the non-balloon loan payment loan is what should have been   09:03:43

16  applied and that that's what we're obligated to do, but they

17  wouldn't take the money.  We tendered the money under that

18  agreement and they refused to accept it.

19          THE COURT:  So there's no agreement in place right

20  now and you just don't pay your mortgage because there's     09:04:00

21  nothing that's required to be paid.  Is that your position?

22          MR. VITALE:  Yes.  The bank's position and Bryan

23  Cave's position is that there's no mortgage.  There's no

24  mortgage modification in place.  We believe --

25          THE COURT:  I'm just saying your position is there's  09:04:15

1  no mortgage in place, you don't owe anything.

2      MR. VITALE:  That's the unfunded loan argument, but

3  that's a separate issue from what you're asking us, I think.

4      THE COURT:  Okay.

5      Well, explain to me.  There's two different ways of          09:04:28

6  you're not -- two reasons why you're not paying?

7      MR. VITALE:  We had an unfunded loan --

8      THE COURT:  Is there another reason why you're not

9  paying other than the unfunded loan argument?

10     MR. VITALE:  Because they wouldn't take the money.          09:04:40

11     THE COURT:  You tendered the money and they wouldn't

12  take it.

13     MR. VITALE:  Yes.  Under the terms of the loan

14  modification agreement, it did not include the balloon

15  payment.  Our first payment was due in September.  We offered   09:04:48

16  it to them.  They refused to accept it and they said, "We're

17  not going to honor that deal."  We tried to pay it.  They

18  wouldn't take the money.

19     THE COURT:  And you've -- okay.  So it's the bank

20  that wouldn't accept the money and you've been tendering the    09:05:01

21  money all along.

22     MR. VITALE:  We made our -- the first three TPP pages

23  were June, July and August of 2012.

24     THE COURT:  Yeah.

25     MR. VITALE:  The first payment under the agreement,          09:05:11

1 | as we understood it, was due in October and we tendered it and
2 | they refused it saying we don't have a deal.  We believe we do
3 | have a deal.  We believe that if that deal had gone in effect
4 | we would have been paying $1,247 a month for the last two
5 | years or so.  We believe that's what we owe.                09:05:29
6 |         THE COURT:  Okay.
7 |         MR. VITALE:  But they won't take the money because
8 | they won't honor the terms of the deal.  If we've offered them
9 | money and they won't accept it, I'm not sure what else we can
10 | do.  The notion that we've been living there for four years   09:05:40
11 | for free is not accurate.
12 |         We believe in July we entered into an agreement that
13 | required us to pay $1,247.  We've met the terms of that
14 | agreement by making timely the three TPP payments.  We offered
15 | them the $1,247 payment under the current note loan           09:05:58
16 | modification in September and they did not accept it and they
17 | refused it and said they were not going to honor the original
18 | deal.
19 |         THE COURT:  So that's the reason you haven't been
20 | paying is because you've tendered and they just wouldn't      09:06:11
21 | accept it.
22 |         MR. VITALE:  Yes.
23 |         THE COURT:  It's not -- it doesn't go back to the
24 | original discussion you had where you were told you need to
25 | miss some payments before you qualified for the program.      09:06:20

```
 1          MR. VITALE:  Yes.  As of July of 2012 we thought --
 2  September of 2012 our reason was we thought we had an
 3  agreement, we tendered it, they said no.  Prior to July of
 4  2012, during that roughly year and a half period, we were in
 5  negotiations.                                              09:06:41
 6          It should be recalled that when we filed suit in
 7  March of 2011 --
 8          THE COURT:  Yeah.
 9          MR. VITALE:  -- the bank asked for 90-day extension
10  to answer the complaint --                                09:06:49
11          THE COURT:  Yeah.
12          MR. VITALE:  -- so we could negotiate.  The bank
13  asked for four more 90-day extensions.  Finally, Judge Bolton
14  said no, you have to answer the complaint.  They answered the
15  complaint 14 months after we filed the suit, during which time 09:07:00
16  we were supposed to be in negotiations.
17          In August of 2012 -- 11 they said, fine, apply for a
18  loan, and then they took another 10 months to process the loan
19  application, which is only slightly more complicated than a
20  car loan application.                                      09:07:23
21          So the entire period of delay was not the result of
22  anything we did.  It was because they couldn't get their act
23  together.
24          THE COURT:  Okay.
25          MR. VITALE:  I don't know why it took 14 months to  09:07:30
```

```
 1  answer a complaint and another 10 months to process a loan

 2  application.  Nobody expected it to take that long.

 3          THE COURT:  So the first two years you weren't making

 4  payments was because of the representation to you that you

 5  needed to miss some payments to qualify for the program.       09:07:45

 6          MR. VITALE:  Right.

 7          THE COURT:  The last two were based on negotiations

 8  that never really materialized.

 9          MR. VITALE:  I think that's a fair statement.

10          THE COURT:  Okay.                                      09:07:53

11          And was there some statement or promise made in the

12  negotiations that said while we're negotiating you don't have

13  to make any payments?

14          MR. VITALE:  I cannot represent to the Court that

15  Mr. Dvoren ever made that explicit a statement.  What happened 09:08:12

16  instead is we were not making the payments, they entered into

17  a stipulated order that they would not foreclose during the

18  pendency of the matter.  If they gave up their right to

19  foreclose, they didn't -- they didn't -- when the stipulation

20  was filed with the Court and renewed four times nothing was    09:08:33

21  required or discussed or demanded that we pay during the

22  period of that injunction.

23          THE COURT:  Okay.  And at some point you thought you

24  had a modified loan.

25          MR. VITALE:  We did.                                   09:08:48
```

1          THE COURT:  Was that September of 2012?

2          MR. VITALE:  No.  It was July of 2012.

3          THE COURT:  July 2012.

4          MR. VITALE:  Prior to the three TPP payments.

5          THE COURT:  Okay.                                    09:08:55

6          MR. VITALE:  We thought we had a deal.

7          THE COURT:  How was that -- was that ever put in

8  writing or was that just an oral agreement?

9          MR. VITALE:  No.  There were four e-mails from

10  Miss Neumeyer to us, which we've cited, they're attached to   09:09:05

11  the third amended complaint.

12          THE COURT:  It's the e-mails you're relying on as a

13  basis --

14          MR. VITALE:  Yeah.

15          THE COURT:  -- for the offer and acceptance regarding  09:09:11

16  the modification of the loan.

17          MR. VITALE:  That's right.

18          THE COURT:  Okay.

19          MR. VITALE:  Judge Bolton ruled that that wasn't

20  sufficient for a contract but it was sufficient to state a    09:09:19

21  claim for promissory estoppel.

22          THE COURT:  And now you've got this modification of

23  loan, you tender the payments, they refuse it --

24          MR. VITALE:  Yes.

25          THE COURT:  -- and that's why you haven't been making  09:09:32

1  the payments since July of 2012.

2          MR. VITALE:  September of 2012.

3          THE COURT:  September of 2012.

4          MR. VITALE:  Yes.

5          THE COURT:  Okay.                          09:09:39

6          Now let's talk about your unfunded loan theory.  Did

7  you ever in any of the pleadings, pleadings being the

8  complaint --

9          MR. VITALE:  Yes.

10         THE COURT:  -- or amended complaints, ever request a   09:09:53

11  declaratory judgment that the note guaranteeing the loan is

12  invalid because the loan was never funded?

13         MR. VITALE:  We did not seek declaratory judgment and

14  we did not assert explicitly that the note was not valid.  We

15  did not know that until April of this year.               09:10:09

16         THE COURT:  Okay.

17         Now, is it your position that no loan exists, no loan

18  obligation exists?

19         MR. VITALE:  Yes.

20         THE COURT:  Because the loan was never funded.        09:10:23

21         MR. VITALE:  Yes.  Therefore, the note fails for want

22  of consideration.

23         THE COURT:  But aren't your claims that you're

24  pursuing predicated on a loan modification?

25         MR. VITALE:  They're alternative theories, Your        09:10:37

1  Honor.  If the Court finds -- they're mutually exclusive.

2  It's one or the other.  It can't be both.  If the Court finds

3  that the note was valid, then the modifications theory we've

4  just discussed is applicable.  If it turns out the Court finds

5  that the note was unfunded and there was no note, then you          09:10:52

6  have a separate line of argument.  They are mutually

7  exclusive.  You can't have both.

8          THE COURT:  Okay.  So if it's an unfunded loan then

9  there really is no loan and you have no obligation to ever pay

10 them.                                                               09:11:08

11          MR. VITALE:  Not to Bank of America, no.

12          THE COURT:  Who would your obligation extend to to

13 pay?

14          MR. VITALE:  I don't know.  It's not -- it doesn't

15 matter who we have to pay.  It's who we don't have to pay that      09:11:17

16 matters.  The claimants here are Bank of America and

17 theoretically Fannie Mae.  They have no entitlement to the

18 money.  Preferred Mortgage never funded the loan.

19          So I don't know what happens next, but we will -- it

20 is not helpful to try and figure out who should get the money.      09:11:32

21 The question is, can Bank of America get the money?  And the

22 answer is no because they are an assignee of the note for

23 which there was no consideration, and they certainly knew

24 that.  So they're not holders in due course.

25          If Preferred Mortgage never funded the loan, then          09:11:48

```
 1  Preferred Mortgage doesn't even qualify under the definition

 2  of a lender.  You have to actually lend the money.

 3              THE COURT:  Okay.

 4              All right.  So your alternative theories are either

 5  it's an unfunded loan for which we don't owe Bank of America       09:12:05

 6  and there's somebody out there that we don't know who it is

 7  that lent the money that we owe it to.

 8              MR. VITALE:  Right.

 9              THE COURT:  Or if it's not an unfunded loan, there's

10  a loan modification and they're not living up to their end of      09:12:16

11  the deal.

12              MR. VITALE:  In summary, yes.

13              THE COURT:  Okay.

14              All right.  Then finally, what is your theory, if you

15  have one, other than the unfunded loan, that Bank of America       09:12:29

16  is a debt collector for purposes of the FDCPA?

17              MR. VITALE:  Because as Judge Bolton found, in

18  December of 2010 Bank of America received an assignment of the

19  deed of trust and the note.  Judge Bolton ruled that that made

20  Bank of America the owner.  At that point they wouldn't have       09:12:50

21  been a debt collector.

22              Subsequently, both in interrogatory answers and in an

23  April 30th, 2013 letter from Mr. Iannelli, Bank of America

24  claims to be the servicer for Fannie Mae.

25              So at some point things changed.  We don't know the    09:13:07
```

exact date.  But you can't service your own loan.  That's not

the definition of a servicer.  You may be able to perform that

function but a servicer by definition, by regulation is an

entity that collects money on behalf of a third party and

disburses it according to the instructions given by the                      09:13:24

obligor.

        THE COURT:  Okay.

        MR. VITALE:  So that was her theory.  The facts

remain -- the facts upon which she made that decisions remain

unchanged.  Bank of America became the owner of the note on             09:13:36

December 30th, 2010, and subsequently became the servicer for

Fannie Mae.  Well, they couldn't service the loan for Fannie

Mae unless Fannie Mae had acquired ownership.  How and when

that happened we don't know, but that's what they say

happened, and that's what she relied upon.                              09:13:54

        THE COURT:  Okay.

        All right.  Is there anything else you want to add?

        MR. VITALE:  There was a footnote in her opinion.

        THE COURT:  Judge Bolton?

        MR. VITALE:  Yes, in her July 10th order, I think             09:14:05

it's 137 in the docket, where she talked about the specific

requirements if you're seeking to enforce a security agreement

as an independent basis for liability under the Fair Debt

Collection Practices Act.  And I have nothing to add to what

she said.  I just want to alert the Court that there were two           09:14:21

1  rationales for her decision.

2          THE COURT:  All right.  Thank you.

3          MR. VITALE:  I did have one other point I wanted to

4  clarify with you, Your Honor.

5          THE COURT:  Go ahead.                          09:14:33

6          MR. VITALE:  The arrearage that had accumulated prior

7  to the loan modification that would have been from December of

8  2010 through June of 2012 was taken care of by the TPP.  So

9  once that agreement was entered there was no arrearage.  It

10  was a clean slate under the deal that was offered to us.        09:14:55

11          THE COURT:  Okay.

12          All right.  Thank you.

13          MR. VITALE:  Thank you.

14          THE COURT:  First off --

15          MR. VITALE:  Have a minor accident up here.  Give me    09:15:16

16  just a moment, Your Honor.

17          THE COURT:  Okay.  As long as it's not blood.

18          MR. VITALE:  You still have to argue your own case.

19          Thank you, Your Honor.

20          THE COURT:  Thank you.                         09:15:33

21          The first question is, do you agree that there was a

22  clean slate as of December or whenever the TPP went into

23  effect?

24          MR. IANNELLI:  No, we don't, Your Honor.

25          And I -- you know, I have my whole sort of        09:15:45

1  presentation prepared but I wanted to address that very issue

2  up front, which is the plaintiff, Mr. Vitale, just referred

3  several times to we had a deal, we had a loan modification,

4  there was a clean slate.  That was alleged in this case, that

5  there was a contract to modify the loan on exactly the terms          09:16:03

6  that are being discussed right now.  That was dismissed.

7  Judge Bolton ruled more than a year ago, probably more than

8  two years ago at this point.

9         There was never a contract to modify the loan on the

10  terms that Mr. Vitale is asserting.  The fact that he thinks         09:16:17

11  he has a claim for damages for promissory estoppel is not the

12  same thing as a loan modification and it doesn't excuse the

13  plaintiffs from paying the loan for the past two years.

14         So, no, we don't agree there's a clean slate.

15         And on the same issue of the payments not being made,         09:16:36

16  which seemed to be of interest to the Court, I want to clarify

17  the record on one point, which is Mr. Vitale just argued that

18  the reason the payments weren't made from that initial

19  September 2010 date based on the representations of the bank

20  about the 60 days and all of that up until the July 2012 date       09:16:56

21  is that they were relying on what this individual at the bank

22  said.

23         Well, that's not an accurate statement of the record.

24  Mrs. Rich and I believe Mr. Vitale both indicated at their

25  depositions and, in fact, the Court can discern simply from        09:17:15

1  the complaint that was filed in March of 2011 that within four

2  to five months after they heard that representation they came

3  to believe it wasn't true, and that's alleged in the complaint

4  itself, that that was an untrue statement.

5         Now, our position in the papers is that it wasn't an        09:17:32

6  untrue statement, but that's beside the point.  From March

7  2011 until today, and certainly until July 2012, there's no

8  contention being made that the plaintiffs believe they had to

9  be in default to have a loan modification review take place.

10        The reason they weren't paying, as was very candidly      09:17:55

11 described by Mrs. Rich in her deposition, and I actually can

12 just forward -- I have a presentation, Your Honor, but I can

13 forward to this right here -- it's up on the screen right

14 here.

15        THE COURT:  For the record, what are you showing me?    09:18:14

16        MR. IANNELLI:  Your Honor, I'm showing you an excerpt

17 from the deposition of Mrs. Rich.  This was attached to the

18 summary judgment briefing.

19        THE COURT:  What exhibit is it?

20        MR. IANNELLI:  I don't know, Your Honor, what the        09:18:26

21 exact --

22        THE COURT:  What was the date of the deposition?

23        MR. IANNELLI:  Excuse me?

24        THE COURT:  The date of the deposition?

25        MR. IANNELLI:  It was, I believe, in March of this       09:18:31

1   year.

2          THE COURT:  March 2014?

3          MR. IANNELLI:  Correct.

4          THE COURT:  What page are you showing?

5          MR. IANNELLI:  This is page 38 and 39.          09:18:41

6          THE COURT:  Okay.

7          MR. IANNELLI:  And we're having a discussion about

8   why they're not paying the mortgage, and what Mrs. Rich

9   testifies is, the reason we're not doing it is I think the

10  judge called it a sufficient breach, which I think is a       09:18:58

11  mis-transcription of efficient breach, that sometimes you

12  don't hold to a contract because it's sufficient or efficient

13  economically not to.

14         So this is the evidence as to why the loan payments

15  haven't been made.  The only causal relationship with the     09:19:14

16  statement of the bank is that those first four or five months,

17  and there's not been any description or evidence of how the

18  plaintiffs were damaged by not making payments for a couple of

19  months in 2010, early 2011, that's somehow different from the

20  45 other payments they've missed for completely different      09:19:39

21  reasons since that date.

22         So I just wanted to clarify that point -- the record

23  on that point for the Court.

24         Does Your Honor have any other questions for me

25  before --                                                      09:20:00

1       THE COURT:  Well, I'd like you to address the issues

2  that were responded to by Mr. Vitale that I just went through

3  with him.  Do you want --

4       MR. IANNELLI:  No.  I -- that was -- those were

5  actually the precise issues I was planning to focus on today,     09:20:15

6  because I think that they are the key issues in the case.  You

7  know, the complaint is divided into these two parts.

8  Basically, the causes of action on each part are the same.

9  There's the promissory estoppel, fraud, negligent

10  misrepresentation, and then the FDCPA claim on Part 2.          09:20:32

11       But it's really these Part 2 allegations regarding

12  the July and September 2012 loan modification issues that have

13  really become sort of the meat of the case, and that's really

14  what I want to address first and what I think the Court was

15  most getting at today, and that's this concept of the loss of   09:20:53

16  a loan modification or the benefit of the bargain.

17       I just want to be clear that the plaintiffs have not

18  lost any loan modification in this case.  In fact, the facts

19  are completely contrary to that.  The bank has reviewed these

20  plaintiffs at least three times, more likely four times, for    09:21:15

21  loan modifications over the past four years, resulting in two

22  offers to the plaintiffs being made.

23       The first of those comes in June of 2011 very shortly

24  after this lawsuit was filed.  Plaintiffs rejected that offer.

25  Then there's a process to review them again for another         09:21:32

1  modification program, Fannie Mae modification program, and

2  that results in the September 2012 offer that's now at issue,

3  so a second offer.  Plaintiffs again reject that offer.

4          THE COURT:  Now, I just heard him say that there was

5  a deal there.  That was his argument.                    09:21:52

6          MR. IANNELLI:  Right.

7          THE COURT:  That there was a modification agreement

8  as of September 2012 and that you guys are, in fact, the ones

9  who breached the agreement.

10         MR. IANNELLI:  Right.                             09:22:05

11         And the answer to that, Your Honor, is there was no

12  deal.  What occurred there is what's called a trial payment

13  plan, and so -- I can kind of work through the time line to

14  help the Court understand the facts.

15         I've put up on the screen -- this is just a time line 09:22:20

16  that I prepared.

17         THE COURT:  What are you -- is this a document that

18  was not contained anywhere in our --

19         MR. IANNELLI:  No.  This is just for illustrative

20  purposes.                                                09:22:33

21         THE COURT:  Can you give me a copy of this for

22  review?

23         MR. IANNELLI:  Yes, certainly.

24         This process begins in May.

25         THE COURT:  This is the demonstrative exhibit that  09:22:44

```
1  puts the time line in place.

2          MR. IANNELLI:  Correct.  All of the documents that

3  are cited in the exhibit are cited in the -- are exhibited to

4  the summary judgment papers.

5          THE COURT:  And you've provided plaintiffs a copy and    09:22:52

6  you'll provide me a copy?

7          MR. IANNELLI:  Yes.

8          THE COURT:  Okay.

9          MR. IANNELLI:  I have a paper copy, Your Honor, if

10 you'd like to have one right now.                              09:22:59

11         THE COURT:  Yeah.  I won't make this part of the

12 record but this is something I'll review.

13         MR. IANNELLI:  Understood.

14         THE COURT:  Any objection from the plaintiffs to me

15 reviewing this?                                                09:23:18

16         MR. VITALE:  Yeah.  Is there another copy we could

17 take a look at?

18         THE COURT:  I assume you've already given them a

19 copy.

20         MR. IANNELLI:  I don't have another paper copy.        09:23:25

21         THE COURT:  Okay.  Why don't you -- well, will you

22 give him a copy today?

23         MR. IANNELLI:  Yes.  Certainly.

24         THE COURT:  Okay.

25         Mr. Vitale, is your screen showing what he's showing   09:23:38
```

1  me now?

2          MR. VITALE:  It's come up now, yes, I can see it.

3          THE COURT:  You can see what he's talking about?

4          MR. IANNELLI:  So, Your Honor, what we have is in May

5  of 2012 after a period of review the bank approves plaintiffs        09:23:51

6  for a loan modification, and those terms that were approved

7  are memorialized in this May 21st document.  This was prepared

8  by an individual who was deposed in this case.  She submitted

9  a declaration in support of the summary judgment motions.

10         THE COURT:  Who was the individual?                          09:24:18

11         MR. IANNELLI:  Her name is Courtney Jaramillo.  On

12  this document she's identified by her maiden name Courtney

13  Perry.

14         THE COURT:  Was this an exhibit in a deposition?

15         MR. IANNELLI:  This was not a deposition exhibit.           09:24:28

16  This was an exhibit to the summary judgment motion.

17         THE COURT:  All right.

18         MR. IANNELLI:  And this basically just lays out the

19  terms for which the plaintiff is approved, and the one that's

20  of most note is on the bottom middle of the page there's a         09:24:45

21  principal forgiveness amount.

22         THE COURT:  Mr. Vitale, do you have this in front of

23  you, too?

24         MR. VITALE:  Yes.  It's on the screen, Your Honor,

25  and we are familiar with it.                                       09:24:56

1          THE COURT:  All right.  Go ahead.

2          MR. IANNELLI:  And that amount, Your Honor, is zero

3   dollars.  So what that means is the bank has approved -- has

4   not approved any sort of debt forgiveness.

5          THE COURT:  You know, I'm having trouble because my          09:25:07

6   copy, what I'm seeing is dark under different categories.  I

7   see a category that's zero but I can't tell what that category

8   is from this document.

9          MR. IANNELLI:  If you see at the bottom in the

10  middle, there's a yellow highlighted line that says principal          09:25:23

11  forgiveness AMT.

12         THE COURT:  I'm looking at that.  Yeah.

13         MR. IANNELLI:  And it says zero.

14         And so what that means is the bank has approved

15  certain modification terms, but one of the approved terms is          09:25:35

16  not principal forgiveness.  So, in other words, there's going

17  to be changes to the payment schedule, to the monthly payment

18  amounts, to the interest rate, but there's not going to be any

19  reduction to the debt.  And that is made clear in this May

20  21st document.          09:25:55

21         THE COURT:  This document is given to Mr. Vitale?

22         MR. IANNELLI:  No.  This is an internal bank

23  document.

24         THE COURT:  Okay.

25         MR. IANNELLI:  This is not -- these terms are          09:26:03

1  approved but not yet offered.

2          THE COURT:  Okay.

3          MR. IANNELLI:  And the reason they're not yet offered

4  is that the typical process is once the terms are approved the

5  bank requires the plaintiff, any borrower, to go through          09:26:16

6  what's called a trial period.

7          And what that means is the borrower is invited to

8  make three monthly payments at or about the amount that it

9  would be if the loan were modified under the approved terms,

10 and if they demonstrate that they can do that successfully      09:26:35

11 then the bank makes them the final permanent loan modification

12 offer.

13         So that's what happens in this case, and the document

14 that the Court is now looking at is a June 21st letter to the

15 plaintiffs offering them this trial period, and what the        09:26:54

16 letter indicates is you must make these three payments; at the

17 end of that period if you remain qualified for the program and

18 successfully make the payments then we will send you an offer

19 for a permanent loan modification.

20         So the obligation under this document, which has been   09:27:17

21 called the TPP offer in the case, the obligation there is just

22 to make the plaintiffs an offer for a loan modification if

23 they complete the trial period.

24         If plaintiffs do not complete the trial period --

25 this is just an excerpt from the same document.                 09:27:34

```
 1          If the plaintiffs or any borrower doesn't complete
 2   the trial period, which, of course, is their prerogative, the
 3   loan won't be modified.  So they have a choice.
 4          THE COURT:  Basically, what you're showing me is
 5   what?  What is this?                                          09:27:49
 6          MR. IANNELLI:  This is an excerpt from the same
 7   documents that was just up on the screen from this letter.
 8          THE COURT:  So this is from the letter that went to
 9   the plaintiffs.
10          MR. IANNELLI:  Correct.  Correct.                      09:27:57
11          So what occurs is, in the typical situation most
12   borrowers that I've dealt with will just sign the paper and
13   make the payments, then they'll get their loan modification
14   offer at the end of the trial period.  What occurs in this
15   case is somewhat different.                                   09:28:15
16          This loan was involved in litigation, and so
17   communications were going through Bryan Cave as an
18   intermediary.  Instead of just signing the offer, plaintiffs
19   submitted a series of questions to Bryan Cave which were
20   forwarded to Bank of America, which were generally about what 09:28:35
21   would the terms of the actual modification offer look like if
22   there were to be an offer, if we complete the trial period?
23          And that's where really the dispute in this case
24   arises.
25          And I'll acknowledge to the Court that those          09:28:55
```

communications were not a model of clarity certainly on either

side, and it's not my purpose today to sort of make the

arguments that are in the summary judgment briefs as to why

they were not misleading.  I think we can assume for purposes

of this argument just to focus the issues that the plaintiffs          09:29:13

were confused and misunderstood if they completed this trial

period what kind of offer the bank would make them in the

future.

        And we can also assume that was totally the fault of

the defendants in the case and should have some responsibility    09:29:31

for any damages that are resultant from that.

        The issue for the Court is an issue of causation, and

I think the Court homed in on that by asking about damages to

begin with.  What is the result of the plaintiffs believing in

the middle of this process that they were going to get            09:29:50

something that wasn't really approved?

        And so just for clarity -- this is that modification

analysis document again.

        The miscommunication, it's concerning this principal

forgiveness amount term.  If there had been a clear question      09:30:11

asked, will you forgive principal, will there be debt

reduction, clearly the answer would have been no, but because

of this miscommunication plaintiffs come to believe that the

offer is going to include some sort of principal forgiveness

component:  Part of their debt is going to be erased as part      09:30:31

1  of this modification.  That's what they believe.

2        Now, that's certainly not true.  The bank never

3  intended to do that, never approved that.

4        And another issue, just on that point, as the

5  plaintiffs alluded to, this is a Fannie Mae loan.  So Bank of        09:30:49

6  America is obligated to follow Fannie Mae's instructions when

7  it is servicing the loan, and part of those instructions are

8  that Fannie Mae does not approve principal forgiveness loan

9  modifications.

10        So not only is this a situation where the bank has        09:31:07

11  not approved any sort of debt reduction.  It was actually

12  prohibited from approving any sort of debt reduction.

13        Now, taking plaintiffs at their word, as a result of

14  this misunderstanding about what the potential offer might be

15  they do decide to complete the trial period.  So they make the        09:31:31

16  three trial payments.  That lasts through September of 2012.

17  And then in September the bank actually makes them a loan

18  modification offer, just as it said it would in that June TPP

19  trial payment letter.

20        And that offer is here.  This is a letter, again        09:31:49

21  attached, I think, to both parties' summary judgment motions.

22        THE COURT:  Mr. Vitale, do you have a copy of this in

23  front of you?

24        MR. VITALE:  Yes.  Thank you.

25        THE COURT:  Okay.        09:32:08

1      MR. IANNELLI:  This is the September 2012 offer.
2  This is the loan modification offer.  And the Court --
3      THE COURT:  This is after the three payments.
4      MR. IANNELLI:  Correct.
5      THE COURT:  Okay.  And this is when, I think, the          09:32:20
6  plaintiffs think they have reached an agreement that there's
7  going to be a modification.
8      MR. IANNELLI:  Correct.
9      Well, in fact, the bank offered a modification, and
10 if the plaintiffs had signed this letter we wouldn't be in     09:32:31
11 court today.  They would have accepted the offer.  There would
12 be a modified loan.  The problem is, the plaintiffs were not
13 satisfied with the terms of this offer.
14     Now, I'll just represent to the Court --
15     THE COURT:  Let me ask you this:  Under the terms of      09:32:48
16 this offer, to accept it they had to sign this page, this
17 letter?
18     MR. IANNELLI:  Correct.  Yeah.  This is just a --
19 this is like a three-page letter, but this is --
20     THE COURT:  If they don't sign it then as far as          09:33:00
21 you're concerned there is no modification.
22     MR. IANNELLI:  Yeah.  There's no contract.  Right.
23     But plaintiffs don't do that.  They reject this.  And
24 the reason they say they reject it is that it's not the same
25 as what the Bryan Cave lawyer caused them to misunderstand the  09:33:16

1  the offer might be.  So it wasn't the offer they were

2  expecting, and so they reject it.

3          THE COURT:  No principal reduction.

4          MR. IANNELLI:  There's no principal reduction.

5  Right.                                                    09:33:31

6          Now, the issue is, you know, we -- we appreciate that

7  at some point in this process plaintiffs formed a

8  misunderstanding or a belief or an expectation that was not

9  consistent with the facts, and we appreciate that as a result

10 of that misapprehension they may have gone and done things in   09:33:53

11 reliance on that; for instance, making the trial payments.

12         It's quite clear, it's really the crux of the whole

13 case, that they say they wouldn't have made those payments if

14 the Bryan Cave lawyer had accurately described to us what

15 offer we were going to get.  We would have just respectfully   09:34:14

16 declined and maybe gone and done something else.  None of that

17 has really been developed as to what would have happened, but

18 what's clear is they would have rejected this and not got this

19 September offer or anything.

20         THE COURT:  Had they rejected this, then your           09:34:29

21 position is they would still be under the original loan

22 agreement.

23         MR. IANNELLI:  Correct.  Unless they went out and,

24 you know, got some other modification assistance.  I don't

25 believe.  I mean, none of that has been developed by the       09:34:40

1  plaintiffs in the case.

2          THE COURT:  But under the facts of this case, it's

3  either this or the original.

4          MR. IANNELLI:  Correct.  Yes.

5          THE COURT:  All right.                              09:34:48

6          MR. IANNELLI:  And so they say we wouldn't have done

7  this if we had a correct understanding of what the offer was

8  going to be.  And we don't disagree with that.  So we returned

9  the three trial payments to plaintiffs.  We returned that with

10 interest at ten percent.                                    09:35:05

11         So, you know, we think we have made them whole in

12 terms of what their loss is.

13         Now, conceivably there could be some other sort of

14 loss.  One could imagine all kind of scenarios.  You know,

15 maybe they go and contract to sell the house because they     09:35:21

16 think they're going to get a good principal reduction and make

17 a profit.  One could imagine a number of ways plaintiffs could

18 be damaged by this.

19         The problem is, this occurred two years ago.

20 Plaintiffs had 12 months to take discovery.  As Your Honor    09:35:37

21 sort of alluded to with the lost opportunities issue, none of

22 that has been evidence.  So all we've been left with is these

23 three trial payments that we wouldn't have made, and my client

24 has made them whole in that regard.

25         So we're now at a point in the case where we're not   09:35:55

1   talking anymore about actual causation.  We're not talking

2   about but-for damages.  That's not what the case is about.

3           In fact, I think Mr. Vitale explains it the best

4   himself.

5           THE COURT:  What are you showing me now?                09:36:13

6           MR. IANNELLI:  This is an excerpt from Mr. Vitale's

7   deposition, again, taken in March of this year.  I do not have

8   the page number but it was exhibited to the summary judgment

9   motions, and I can provide that to the Court later today.

10          THE COURT:  Do you have a copy of this in front of      09:36:29

11  you?

12          MR. VITALE:  Yes.  It's on the screen, Your Honor.

13          THE COURT:  Okay.

14          MR. IANNELLI:  And so, you know, I'm asking him at

15  the deposition, "As a result of this deception," as they        09:36:37

16  characterize it, "what did you do or what didn't you do?"  And

17  he says, "I was deceived into applying for a loan that was

18  never going to happen."

19          And we agree with that.  The principal reduction

20  thing was never going to happen.  That's not disputed by the    09:36:57

21  parties.

22          And again, this is also the -- this one is impossible

23  to read on this screen.  I'm sorry, Your Honor.

24          THE COURT:  Mr. Vitale, do you have a copy in front

25  of you?                                                          09:37:13

```
 1            MR. VITALE:  Yes.

 2            THE COURT:  Okay.

 3            MR. IANNELLI:  This is another excerpt from

 4    Mr. Vitale's deposition.  This one is in relation to the

 5    promissory estoppel claim, and he's saying they promised        09:37:18

 6    something they couldn't do.  In other words, the principal

 7    reduction.

 8            And again, my clients agree with that.  We couldn't

 9    give him a principal reduction.  It wasn't possible.  It

10    wasn't anything we ever intended to do or approved to do or      09:37:31

11    were authorized to do.

12            So the parties agree about all of this, and where we

13    are, then, is plaintiffs are -- I just put this prior quote

14    back up on the screen.  He's describing now his damages.

15            "What did you lose by reason of applying for a loan      09:37:50

16    that wasn't going to happen?"

17            And the answer is, "The benefit of the loan."

18            Well, that's a contract claim.  Mr. Vitale is saying

19    I was entitled, I had an expectation interest in a loan

20    modification term, you didn't give it to me, I lost that        09:38:08

21    benefit, therefore, I should get it now.  That's really what

22    the essence of this entire case now is.

23            And the problem with that is, there was never a

24    benefit.  It was never offered or approved or intended to be

25    approved.  The plaintiffs never had a principal reduction, and  09:38:29
```

1  so they haven't lost a principal reduction.  So there are

2  no -- there's no expectation damages.

3          And I think it's important just to again go back and

4  recall.  Plaintiffs sought that relief under a breach of

5  contract theory, saying you are contractually obligated to          09:38:50

6  give me a principal reduction.  That is equivalent to what is

7  now up on the screen.  And Judge Bolton dismissed that, saying

8  there was not a bargain to get you a principal reduction, that

9  was not the deal, as Mr. Vitale phrases it.

10          THE COURT:  Can you wrap it up?          09:39:07

11          MR. IANNELLI:  Yeah.

12          Let me just touch real briefly, Your Honor, on the

13  Part 1 allegations of the complaint; that is, all the things

14  that occurred before the principal reduction issue.

15          And I think the Court can dispose of that without          09:39:22

16  even considering most of the things that are in the brief,

17  because what Mr. Vitale has said, and he alluded to it just

18  now, is that the reason -- and this is an excerpt from their

19  summary judgment response where we're arguing how were you

20  damaged by these allegations in Part 1?  And what he says          09:39:43

21  is -- this is an excerpt, by the way, from a 43-page document.

22  This is the only response to this argument that you weren't

23  damaged by the bank manager's statements and everything else

24  in Part 1 of the complaint.

25          They're saying, "I was damaged because that began a          09:40:04

1   course of conduct that ultimately led to my losing this

2   principal reduction in 2012.  That's my damages."

3            And even if we accept that logic --

4            THE COURT:  What are you showing me now?  Is this

5   transposed on something or is this what they -- I don't          09:40:21

6   remember.  You say plaintiffs were not injured by conduct --

7            MR. IANNELLI:  This is an exact -- this is a screen

8   capture from their -- they worded the caption headings

9   equivalent to ours, so yeah, I understand it's confusing.

10           So it's now unclear to me why we need to have a trial   09:40:38

11  on Part 1, because what they're saying is Part 1 caused this

12  process that led to Part 2 wherein I was damaged.  So we can

13  just have a trial, if there's going to be a trial, on Part 2

14  and everything in this Part 1 can go away because it's not an

15  independent proposition.                                          09:40:58

16           And so I think otherwise the briefs adequately set

17  forth what our arguments are.  Unless the Court has any other

18  questions for me, I will wrap up as you indicated.

19           THE COURT:  All right.  Thank you.

20           For the record, I'm going to go ahead and make this     09:41:26

21  part of the record, the exhibits that were used as part of the

22  oral argument, just so it's clear what we were looking at.

23           MR. VITALE:  Your Honor, in the e-mail submitted to

24  us by Miss Neumeyer, the Bank of America attorney, in --

25           THE COURT:  Are these the e-mails that he concedes      09:41:44

1   were confusing?

2          MR. VITALE:  He claims they're confusing.  They're

3   not.

4          THE COURT:  Okay.

5          MR. VITALE:  I asked -- we asked, "Is there a balloon   09:41:52

6   payment?"  The response was, "This is not a balloon loan,

7   there is no balloon payment."

8          THE COURT:  Now how does that relate to principal?

9   Because that seems to be the issue.

10          MR. VITALE:  That's the same thing under the   09:42:04

11   paragraphs identified in the frequently asked questions which

12   are submitted with the -- the balloon payment couldn't be

13   anything else.

14          THE COURT:  Okay.  Than principal.

15          MR. VITALE:  Right.  So there was no confusion about   09:42:16

16   that.

17          As far as the measure of damages, under promissory

18   estoppel, it's the benefit of the bargain.  Under the Fair

19   Debt Collection Practices Act, and the consumer fraud statute,

20   it is also a benefit of the bargain:  What you would have   09:42:32

21   received had they gone through with the terms that were

22   offered.  The term unequivocally offered were 195, 480 months,

23   at 4.65 percent, with no balloon.  There is no ambiguity about

24   that.  All the documents that were referred to, the loan

25   modification analysis, we never saw those.   09:42:54

1          More importantly, in another one of the e-mails

2    Miss Neumeyer said that those were the terms of the loan that

3    have been approved by Fannie Mae, past tense.  Those terms

4    were approved before we signed the TPP.  This case was not the

5    typical loan modification where you get the final terms after          09:43:13

6    the TPP.  They were laid out in advance.  And it's more than

7    just a jury question as to whether or not they mean what we

8    say.

9          But, more importantly, by acknowledging, even from

10   their point of view, the terms are confusing, they've                  09:43:30

11   acknowledged that there is a jury issue.

12         THE COURT:  Well, he argued that the only damage

13   you've lost is -- at least that his argument is -- the only

14   damage you claim you've lost is the loss of the bargain.

15         MR. VITALE:  Yes, and the present discounted value            09:43:46

16   between the two notes.  We have to pay 83,000 -- by not going

17   through with the deal, we're under the terms of our original

18   note.

19         THE COURT:  Uh-huh.

20         MR. VITALE:  And I will offer this, Your Honor, as an         09:43:58

21   illustration that our expert will testify that the present

22   discounted value between those two loans is $144,000 over the

23   term of the note.

24         Now, we had originally asked for specific

25   performance.  We did not know at that time that, apparently,         09:44:13

this was not possible.  But the damages are not reliance

damages as alleged by the defendants.  They are benefit of the

bargain under all three of those theories.  And we've cited

the case law in our memorandums.

But particularly as to promissory estoppel, that's

not even a close question, and Judge Bolton found that there

were more than enough facts to support the claim under

12(b)(6).  Those facts remain part of the record.  They're

disputed.  Therefore, it's a jury question that cannot be

resolved here.  The dollar amount of the present discounted

value is also something that the jury will have to decide.

But what's critical here is, we have specific terms

in writing that confirms not once but three times no balloon

payment.  Fannie Mae has approved the loan.  We made the

payments required and then the balloon payment shows up in the

final documents, inconsistent with the written record.

And there are only written representations.  This is

not a he-said-she-said claim.  They're laid out in four simple

e-mails that are not ambiguous.  But even if they are

ambiguous, they should be interpreted against the bank.

Moreover, it presents a jury question as to whether we were

confused.

THE COURT:  Okay.

MR. VITALE:  Give me just a moment.

Oh.  As to the claim that this is not what they

1 intended to do, it doesn't matter what the corporation's

2 subjective intent is.  It's what the words that they said

3 meant, not their subjective intent.

4          Do you have any other questions, Your Honor?

5          Oh.  By the way, on the payments that they said they          09:46:06

6 sent us, we sent them back immediately and rejected it because

7 it was really a settlement of the lawsuit.  It was not a

8 return of our money.  So we rejected that tender.

9          THE COURT:  So the statements that you contend were

10 false were the communications by e-mail that you received from          09:46:20

11 the bank's attorneys.

12          MR. VITALE:  Yes, four of them, in early July, and

13 they're all exhibits to the third amended complaint.

14          THE COURT:  Okay.

15          MR. VITALE:  That's the crux of it.  You read those          09:46:30

16 four e-mails you know what that part of the case is about.

17          The other thing is, to the Part 1/Part 2 argument,

18 this case is best understood as a simple bait and switch.  The

19 first misrepresentation took place in September of 2010 when

20 Mr. Marsh told us we missed the payments.  It was completed          09:46:45

21 two years later when the loan modification was not given to

22 us.  The fact that it's broken down into Part 1 and Part 2 was

23 strictly a convenience for pleading purposes for clarity of

24 illustrating what happened.

25          THE COURT:  Is it your position that by making those          09:47:05

1  payments that was the acceptance of the offer for the

2  modification?

3          MR. VITALE:  The original offer, yes.

4          THE COURT:  Okay.  The original offer --

5          MR. VITALE:  Without the balloon payment.                  09:47:19

6          THE COURT:  Which involved the communications from

7  the bank's attorneys.

8          MR. VITALE:  The four e-mails.

9          THE COURT:  And so by making your payments that was

10 your notice to them that you accepted the offer.               09:47:27

11         MR. VITALE:  Yes.

12         THE COURT:  You didn't need to sign or accept

13 anything in writing for the bank that --

14         MR. VITALE:  We signed the TPP.

15         THE COURT:  Okay.  But the letter they sent out to    09:47:38

16 say, okay, now here's the real deal.

17         MR. VITALE:  That was the September one.  No, we did

18 not sign that one.

19         THE COURT:  And your argument is that wasn't

20 necessary because you already had a bargain.                   09:47:48

21         MR. VITALE:  Right.  It was inconsistent with what we

22 had been promised and so had we signed it we would have waived

23 any claims for the misrepresentation.

24         THE COURT:  The damages you suffered are the

25 difference between what you would have owed under the original 09:48:02

```
1  contract versus --

2          MR. VITALE:  Right.

3          THE COURT:  -- what you would -- what you have owed

4  under the terms of the contract -- the modification were based

5  on the representations to you by the bank's attorneys.          09:48:12

6          MR. VITALE:  Precisely.

7          THE COURT:  Okay.

8          MR. VITALE:  Do you have any other questions, Your

9  Honor?

10          THE COURT:  Let me just take a few moments here.        09:48:19

11          Do you have any information or evidence that the bank

12  or its subsidiaries or predecessors did not continuously

13  service the loan since 2006?

14          MR. VITALE:  Yes.

15          THE COURT:  What is that?                               09:48:42

16          MR. VITALE:  The Milestone report that was originally

17  submitted with our motion to vacate the March 2013 assignment

18  of deed of trust.  The Mile -- is -- is the Court familiar

19  from our record as to how the Milestone report works?

20          THE COURT:  Yeah.                                       09:48:58

21          MR. VITALE:  Yes.  It was shown that in 2011 the

22  servicing rights and everything else to do with our loan was

23  transferred to a non-MERS member.  We don't know who that was.

24  We don't know if it's an accurate representation but there is

25  evidence that as of 2011 something else happened.              09:49:12
```

```
 1              THE COURT:  That's in the Milestone report?
 2              MR. VITALE:  Yes.  It's a one-half-page computer
 3   printout and it's been submitted to the Court.
 4              I would also add on the -- I don't know to the extent
 5   that Your Honor is considering the -- considering this in          09:49:27
 6   conjunction with the motion in limine but the bank utilized
 7   the deposition transcript of Miss Estrada in its motion in
 8   limine to illustrate the weakness of her arguments.  In other
 9   words, they used it on the merits.  Miss Estrada's
10   deposition -- or report --                                         09:49:51
11              THE COURT:  Okay.  We're not here to argue the motion
12   in limine.
13              MR. VITALE:  Okay.
14              THE COURT:  All right.
15              MR. VITALE:  That's all I have, Your Honor.             09:49:55
16              THE COURT:  Is there anything else to talk about?  I
17   think there's an issue regarding the trial date?
18              MR. IANNELLI:  Yes, Your Honor.
19              May I have two minutes just to address some of the
20   things that Mr. Vitale just said?                                  09:50:05
21              THE COURT:  Okay.  I guess we've got competing
22   motions for summary judgment so each of you have a chance to
23   reply.
24              MR. IANNELLI:  Correct.
25              I just want to make two real quick points.             09:50:19
```

1              First, on the FDCPA claim, there's a lot of

2    speculation about this Milestone's report and it means the

3    bank was no longer the servicer.  That was thoroughly

4    explained by the bank's 30(b)(6) witness at the deposition.

5    Mr. Vitale is speculating what that document means.  It's          09:50:34

6    completely baseless, and I would just urge the Court to review

7    the portions of the cited deposition transcript as it

8    considers that particular argument.  We've had multiple

9    witnesses in this case testify that the bank has been the

10   servicer for this loan continuously since 2006.  That's not       09:50:54

11   really disputed.

12             THE COURT:  And you're saying the only evidence that

13   he's relying on is half-a-page document in the Milestone

14   report?

15             MR. IANNELLI:  Correct.  It's a document produced by     09:51:05

16   a third party that the plaintiff has no real understanding of

17   and is just speculating about.

18             THE COURT:  You say it's not sufficient to create an

19   issue of fact?

20             MR. IANNELLI:  No, not at all.                           09:51:16

21             THE COURT:  Are you arguing that that document would

22   not be admissible at trial?

23             MR. IANNELLI:  I mean, it's -- I don't know that it

24   would be without the proper foundation, unless he gets a

25   witness from that company to come authenticate it.                09:51:27

```
 1              THE COURT:  How is it even a proper exhibit for
 2   purposes of summary judgment motion if there's no foundation
 3   for it?
 4              MR. IANNELLI:  I don't think there is.
 5              THE COURT:  Did you move to strike it?          09:51:37
 6              MR. IANNELLI:  I do.
 7              THE COURT:  I didn't ask you if you do now.  I asked
 8   you had you --
 9              MR. IANNELLI:  No.  We didn't file a separate motion
10   to strike.  I don't think --                              09:51:46
11              THE COURT:  Okay.
12              MR. IANNELLI:  It's not my understanding that's
13   allowed.  I think we probably objected to it in our --
14              THE COURT:  Did you object to it then?
15              MR. IANNELLI:  Yes.                             09:51:52
16              THE COURT:  That's, I guess, my question.
17              MR. IANNELLI:  The only other issue, Judge, I just
18   want to reiterate, Mr. Vitale got back up here and was
19   explaining what his damages are it's all in terms of a
20   bargain, a deal, I accepted the offer.  That's all been    09:52:04
21   dismissed.  So, again, we're talking about the plaintiff is
22   trying to get the benefit of a bargain that was never made.
23              And if the Court looks at the authorities that are
24   cited, it's clear you don't -- that's not the way this works
25   under tort theory, promissory estoppel, anything else.     09:52:18
```

1   There's got to be a contract that you were misled into

2   entering into a fraudulent inducement.  That didn't occur

3   here.

4          THE COURT:  Okay.

5          MR. IANNELLI:  I think Mr. McElenney was going to          09:52:28

6   address the trial date issue.

7          THE COURT:  Okay.

8          MR. MCELENNEY:  Your Honor, we did receive their

9   motion to continue Tuesday night.  I haven't had a chance to

10  really analyze it carefully.                                     09:52:42

11         THE COURT:  Do you want some time to review it?

12         MR. VITALE:  I do.

13         THE COURT:  All right.  Well, then I'll give

14  Mr. Vitale a chance to respond.  I guess he's not ready to

15  talk about it today.                                             09:52:52

16         So let's -- let's -- he may not object and then we'll

17  see if where we can fit it.  Let's -- Mr. Vitale, what is it

18  you need to do to prepare for a motion to continue a trial

19  date?

20         MR. VITALE:  We need to file some information under       09:53:06

21  seal relating to medical issues, Your Honor.  We don't want to

22  get into that in open court.

23         THE COURT:  Okay.

24         All right.  Well --

25         MR. MCELENNEY:  If I might, Your Honor, if I              09:53:16

UNITED STATES DISTRICT COURT

1  understand that correctly, they're not going to oppose the

2  motion to continue?

3          MR. VITALE:  We do oppose it.

4          MR. MCELENNEY:  You do oppose it.  All right.

5          Your Honor, I'm just here today to fall on the sword    09:53:23

6  and ask for some understanding from the Court.  The Arizona

7  Supreme Court, if you've looked at the motion --

8          THE COURT:  I understand that.  I'm -- I think you --

9  you could probably do both.  My concern, though, is I've got a

10 criminal trial that's going longer than we expected and it nay   09:53:38

11 bleed into this date.  So the Court may have a problem with --

12 we may have to continue it a week or so just to get past the

13 criminal trial that's pending.

14         MR. MCELENNEY:  Well, I appreciate your confidence in

15 me thinking that I can do both.  I think it's quite a daunting   09:53:55

16 task to try to prepare for a Supreme Court argument while

17 being in here and --

18         THE COURT:  I'm not going to hear it now.

19         MR. MCELENNEY:  Okay.

20         THE COURT:  Okay?  You can do both but I have a          09:54:03

21 conflict.  I have a criminal trial that bleeds into this date

22 so we may move it a week.

23         MR. MCELENNEY:  Okay.  Thank you, Your Honor.

24         THE COURT:  Okay?

25         Mr. Vitale, if we move this trial a week would that      09:54:12

1  give you a problem with your health issues?

2          MR. VITALE:  No.  A week would not be significant.

3  If we were looking at six months to a year, that's a different

4  matter, but a week --

5          THE COURT:  I haven't looked at my calendar yet so          09:54:25

6  let me --

7          MR. VITALE:  The simple answer to your questions is

8  we do not object to one-week continuance.

9          THE COURT:  And that will give you plenty of time,

10  right?                                                              09:54:37

11         MR. MCELENNEY:  Yes, that would give me adequate

12  time.  Thank you, Your Honor.

13         THE COURT:  Okay.

14         (Discussion with the Courtroom Deputy Clerk.)

15         THE COURT:  All right.  Are the parties available to       09:54:55

16  start this trial on the 19th of --

17         MR. VITALE:  We are, Your Honor.

18         THE COURT:  -- November?

19         MR. IANNELLI:  Yes, Your Honor.

20         MR. VITALE:  May I -- I need to speak to Miss --           09:55:06

21         THE COURT:  Sure.

22         MR. VITALE:  Yes, Your Honor, we can do it the 19th.

23         THE COURT:  Okay.  How many days is this trial?

24         MR. VITALE:  Five.

25         THE COURT:  Okay.  So we'll set it to start on the         09:55:22

```
 1   19th.
 2          What's our date for our final trial management
 3   conference?
 4          MR. MCELENNEY:  November 7, Your Honor, I believe.
 5          THE COURTROOM DEPUTY CLERK:  November 3rd.          09:55:36
 6          THE COURT:  I think we can leave that date.
 7          All right.  Anything else?
 8          I'm going to grant the defendants' motion to continue
 9   the trial by one week and we've moved it to November 19th.
10          MR. VITALE:  I have one housekeeping question, Your   09:55:48
11   Honor.  What is the length of the trial day, Your Honor, in
12   your court.  9:00 to 4:30?
13          THE COURT:  Yeah.  9:00 to 4:30.
14          MR. VITALE:  Thank you.
15          THE COURT:  Yes?                                     09:55:59
16          MR. MCELENNEY:  Your Honor, I apologize.  I'm out of
17   the country on November 3rd.  Mr. Iannelli is capable of
18   handling it but I wanted you to know if I wasn't there it's
19   because I'm out of the country.
20          THE COURT:  All right.  Thank you.                   09:56:09
21          MR. MCELENNEY:  My apologies.
22          All right.  Anything else?
23          MR. VITALE:  No, Your Honor.  I think if you just
24   look at those four e-mails the case will make a lot more
25   sense.                                                      09:56:18
```

1          THE COURT:  I've seen them.

2          MR. VITALE:  Thank you.

3          THE COURT:  All right.  We'll stand in recess.

4          (Proceedings recessed at 9:56 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5

6        I, DAVID C. GERMAN, Official Court Reporter, do hereby

7   certify that I am duly appointed and qualified to act as

8   Official Court Reporter for the United States District Court

9   for the District of Arizona.

10       I FURTHER CERTIFY that the proceedings and testimony

11  reported by me on the date specified herein regarding the

12  afore-captioned matter are contained fully and accurately in

13  the notes taken by me upon said matter; that the same were

14  transcribed by me with the aid of a computer; and that the

15  foregoing is a true and correct transcript of the same, all

16  done to the best of my skill and ability.

17

18

19       DATED at Phoenix, Arizona, this 3rd day of November,

20  2014.

21

22

23                       s/David C. German
                         DAVID C. GERMAN, RMR, CRR
24

25